Slip Op. 18- 132

# UNITED STATES COURT OF INTERNATIONAL TRADE

MIDWEST FASTENER CORP.,

Plaintiff,

v.

UNITED STATES,

Defendant,

and

MID CONTINENT STEEL & WIRE, INC.,

Defendant-Intervenor.

Before: Judge Gary S. Katzmann,
Court No. 17-00131

## <u>OPINION</u>

[Commerce's <u>Final Results</u> are remanded and plaintiff's motion for judgment on the agency record is granted in part.]

Dated:  October 1, 2018

<u>Robert K. Williams</u>, Clark Hill PLC, of Chicago, IL, argued for plaintiff.  With him on the brief were <u>Mark R. Ludwikowski</u> and <u>Lara A. Austrins</u>.

<u>Sosun Bae</u>, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, argued for defendant.  With him on the brief were <u>Chad A. Readler</u>, Acting Assistant Attorney General, <u>Jeanne E. Davidson</u>, Director, and <u>Patricia M. McCarthy</u>, Assistant Director.  Of counsel on the brief was <u>Jessica DiPietro</u>, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce, of Washington, DC.

<u>Adam H. Gordon</u>, The Bristol Group PLLC, of Washington, DC, argued for defendant-intervenor. With him on the brief were <u>Ping Gong</u> and <u>Lydia K. Childre</u>.

Katzmann, Judge:  In this iteration of litigation centering on whether a product  is classified

as a nail, plaintiff Midwest Fastener Corp. ("Midwest") challenges the Department of Commerce's

("Commerce") determination that its imported zinc and nylon anchors fall within the scope of the

<u>Certain Steel Nails From the Socialist Republic of Vietnam: Countervailing Duty Order</u>, 80 Fed.

Reg. 41,006 (Dep't Commerce July 14, 2015), and <u>Certain Steel Nails from the Republic of Korea,</u>

<u>Malaysia, the Sultanate of Oman, Taiwan, and the Socialist Republic of Vietnam: Antidumping</u>

<u>Duty Orders</u>, 80 Fed. Reg. 39,994 (Dep't Commerce July 13, 2015) (collectively, the "<u>Orders</u>").

Midwest argues that its anchors are not steel nails and, therefore, do not fall within the scope of

the <u>Orders</u> and that Commerce's scope determination is unsupported by substantial evidence on

the record and is otherwise not in accordance with law.   The court concludes that Commerce's

determination was not in accordance with law.

## BACKGROUND

**A.      <u>Legal and Regulatory Framework of Scope Reviews Generally.</u>**

Dumping occurs when a foreign company sells a product in the United States for less than

fair value – that is, for a lower price than in its home market.   <u>Sioux Honey Ass'n v. Hartford Fire</u>

<u>Ins. Co.</u>, 672 F.3d 1041, 1046 (Fed. Cir. 2012)).   Similarly, a foreign country may provide a

countervailable subsidy to a product and thus artificially lower its price.   <u>U.S. Steel Grp. v. United</u>

<u>States</u>, 96 F.3d 1352, 1355 n.1 (Fed. Cir. 1996).   To empower Commerce to offset economic

distortions caused by dumping and countervailable subsidies, Congress enacted the Tariff Act of

1930.[1]   <u>Sioux Honey Ass'n</u>, 672 F.3d at 1046–47.   Under the Tariff Act's framework, Commerce

may -- either upon petition by a domestic producer or of its own initiative -- begin an investigation

into potential dumping or subsidies and, if appropriate, issue orders imposing duties on the subject

merchandise.   <u>Id.</u>

---

[1] Further citations to the Tariff Act of 1930 are to the relevant portions of Title 19 of the U.S. Code, 2012 edition.

In order to provide producers and importers with notice as to whether their products fall within the scope of an antidumping or countervailing duty order, Congress has authorized Commerce to issue scope rulings clarifying "whether a particular type of merchandise is within the class or kind of merchandise described in an existing . . . order." 19 U.S.C. § 1516a(a)(2)(B)(vi). As "no specific statutory provision govern[s] the interpretation of the scope of antidumping or countervailing orders," Commerce and the courts developed a three-step analysis. Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States, 776 F.3d 1351, 1354 (Fed. Cir. 2015); Polites v. United States, 35 CIT __, __, 755 F. Supp. 2d 1352, 1354 (2011); 19 C.F.R. § 351.225(k).

Because "[t]he language of the order determines the scope of an antidumping duty order[,]" any scope ruling begins with an examination of the language of the order at issue. Tak Fat Trading Co. v. United States, 396 F.3d 1378, 1382 (Fed. Cir. 2005) (citing Duferco Steel, Inc. v. United States, 296 F.3d 1087, 1097 (Fed. Cir. 2002)). If the terms of the order are unambiguous, then those terms govern. Id. at 1382–83. "[T]he question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists is a question of law that we review de novo." Meridian Prod., LLC v. United States, 851 F.3d 1375, 1382 (Fed. Cir. 2017). As the Federal Circuit has held, the terms of an order govern its scope. Duferco, 296 F.3d at 1097; see Eckstrom Indus., Inc. v. United States, 254 F.3d 1068, 1072 (Fed. Cir. 2001); Wheatland Tube Co. v. United States, 161 F.3d 1365, 1370 (Fed. Cir. 1998). "Although the scope of a final order may be clarified, it can not be changed in a way contrary to its terms." Duferco, 296 F.3d at 1097 (quoting Smith Corona Corp. v. United States, 915 F.2d 683, 686 (Fed. Cir. 1990)). For that reason, "if [the scope of an order] is not ambiguous, the plain meaning of the language governs." ArcelorMittal Stainless Belg. N.V. v. United States, 694 F.3d 82, 87 (Fed. Cir. 2012).

"In determining the common meaning of a term, courts may and do consult dictionaries, scientific authorities, and other reliable sources of information, including testimony of record." NEC Corp. v. Dep't of Commerce, 23 CIT 727, 731, 74 F. Supp. 2d 1302, 1307 (1999) (quoting Holford USA Ltd. v. United States, 19 CIT 1486, 1493–94, 912 F. Supp. 555, 561 (1995)). Furthermore, "[b]ecause the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties, the terms of an order should be consistent, to the extent possible, with trade usage." ArcelorMittal, 694 F.3d at 88.

If Commerce determines that the terms of the order are either ambiguous or reasonably subject to interpretation, then Commerce "will take into account . . . the descriptions of the merchandise contained in the petition, the initial investigation, and [prior] determinations [of Commerce] (including prior scope determinations) and the [International Trade] Commission." 19 C.F.R. § 351.225(k)(1) ("(k)(1) sources"); Polites, 755 F. Supp. 2d at 1354; Meridian Prod., 851 F.3d at 1382.  To be dispositive, the (k)(1) sources "must be 'controlling' of the scope inquiry in the sense that they definitively answer the scope question."  Polites, 755 F. Supp. 2d at 1354 (quoting Sango Int'l v. United States, 484 F.3d 1371, 1379 (Fed. Cir. 2007)).  If Commerce "can determine, based solely upon the application and the descriptions of the merchandise referred to in paragraph (k)(1) of . . . section [351.225], whether a product is included within the scope of an order . . . [Commerce] will issue a final ruling[.]"  19 C.F.R. § 351.225(d).  If the § 351.225(k)(1) analysis is not dispositive, Commerce will initiate a scope inquiry under § 351.225(e), and apply the five criteria from Diversified Prods. Corp v. United States, 6 CIT 155, 162, 572 F. Supp. 883, 889 (1983) as codified in 19 C.F.R. § 351.225(k)(2).[2]

---

[2] These criteria are: (1) the physical characteristics of the product, (2) the expectations of the ultimate purchasers, (3) the ultimate use of the product, (4) the channels of trade in which the

## B.   <u>History of the Orders.</u>

On May 29, 2014, Mid Continent Steel & Wire Inc. ("Mid Continent") petitioned Commerce to impose antidumping and countervailing duties on certain steel nails from Vietnam. Petition for the Imposition of Antidumping and Countervailing Duties Against Certain Steel Nails from India, The Republic of Korea, Malaysia, The Sultanate of Oman, Taiwan, The Republic of Turkey, And The Social Republic of Vietnam, (May 29, 2014).   Subsequently, after having determined that dumping was occurring, Commerce issued its antidumping and countervailing duty Orders covering certain steel nails from the Socialist Republic of Vietnam.   The scope language of the Orders reads in full:

> The merchandise covered by the Orders is certain steel nails having a nominal shaft length not exceeding 12 inches.   Certain steel nails include, but are not limited to, nails made from round wire and nails that are cut from flat-rolled steel.   Certain steel nails may consist of a one piece construction or be constructed of two or more pieces.   Certain steel nails may be produced from any type of steel, and may have any type of surface finish, head type, shank, point type and shaft diameter.   Finishes include, but are not limited to, coating in vinyl, zinc galvanized, including but not limited to electroplating or hot dipping one or more times, phosphate, cement, and paint.   Certain steel nails may have one or more surface finishes.   Head styles include, but are not limited to, flat, projection, cupped, oval, brad, headless, double, countersunk, and sinker.   Shank styles include, but are not limited to, smooth, barbed, screw threaded, ring shank and fluted.   Screw-threaded nails subject to this proceeding are driven using direct force and not by turning the nail using a tool that engages with the head.   Point styles include, but are not limited to, diamond, needle, chisel and blunt or no point.   Certain steel nails may be sold in bulk, or they may be collated in any manner using any material.
>
> Excluded from the scope of the Orders are certain steel nails packaged in combination with one or more non-subject articles, if the total number of nails of all types, in aggregate regardless of size, is less than 25.   If packaged in combination with one or more non-subjected articles, certain steel nails remain subject merchandise if the total number of nails of all types, in aggregate regardless of size, is equal to or greater than 25, unless otherwise excluded based on the other exclusions below.

---

product is sold, and (5) the manner in which the product is advertised and displayed.   19 C.F.R. § 351.225(k)(2); see Diversified Prods., 572 F. Supp. at 889.

Also excluded from the scope are certain steel nails with a nominal shaft length of one inch or less that are (a) a component of an unassembled article, (b) the total number of nails is sixty (60) or less, and (c) the imported unassembled article falls into one of the following eight groupings: 1) builders' joinery and carpentry of wood that are classifiable as windows, French-windows and their frames; 2) builders' joinery and carpentry of wood that are classifiable as doors and their frames and thresholds; 3) swivel seats with variable height adjustment; 4) seats that are convertible into beds (with the exception of those classifiable as garden seats or camping equipment); 5) seats of cane, osier, bamboo or similar materials; 6) other seats with wooden frames (with the exception of seats of a kind used for aircraft or motor vehicles); 7) furniture (other than seats) of wood (with the exception of i) medical, surgical, dental or veterinary furniture; and ii) barbers' chairs and similar chairs, having rotating as well as both reclining and elevating movements); or 8) furniture (other than seats) of materials other than wood, metal, or plastics (e.g., furniture of cane, osier, bamboo or similar materials).   The aforementioned imported unassembled articles are currently classified under the following Harmonized Tariff Schedule of the United States (HTSUS) subheadings: 4418.10, 4418.20, 9401.30, 9401.40, 9401.51, 9401.59, 9401.61, 9401.69, 9403.30, 9403.40, 9403.50, 9403.60, 9403.81, or 9403.89.

Also excluded from the scope of the Orders are certain steel nails that meet the specifications of Type I, Style 20 nails as identified in Tables 29 through 33 of ASTM Standard F1667 (2013 revision).

Also excluded from the scope of the Orders are nails suitable for use in powder-actuated hand tools, whether or not threaded, which are currently classified under HTSUS subheadings 7313.00.20.00 and 7313.00.30.00.

Also excluded from the scope of the Orders are nails having a case hardness greater than or equal to 50 on the Rockwell Hardness C scale (HRC), a carbon content greater than or equal to 0.5 percent, a round head, a secondary reduced-diameter raised head section, a centered shank, and a smooth symmetrical point, suitable for use in gas-actuated hand tools.

Also excluded from the scope of the Orders are corrugated nails.  A corrugated nail is made up of a small strip of corrugated steel with sharp points on one side.

Also excluded from the scope of the Orders are thumb tacks, which are currently classified under HTSUS subheading 7317.00.10.00.

Certain steel nails subject to the Orders are currently classified under HTSUS subheadings   7317.00.55.02,   7317.00.55.03,   7317.00.55.05,   7317.00.55.07, 7317.00.55.08,  7317.00.55.11,  7317.00.55.18,  7317.00.55.19,  7313.00.55.20, 7317.00.55.30,  7317.00.55.40,  7317.00.55.50,  7317.00.55.60,  7317.00.55.70, 7317.00.55.80, 7317.00.55.90, 7317.00.65.30, 7317.00.65.60, and 7317.00.75.00.

Certain steel nails subject to the Orders also may be classified under HTSUS subheading 8206.00.00.00 or other HTSUS subheadings.

While the HTSUS subheadings are provided for convenience and customs purposes, the written description of the scope of the Orders is dispositive.

Orders (emphasis added).

## C.    **Factual and Procedural History of this Case.**

On November 9, 2016, Midwest filed a request with Commerce for a scope ruling that its

zinc and nylon anchors should be excluded from the scope of the Orders.  Certain Steel Nails from

the Socialist Republic of Vietnam: Midwest Fastener Scope Request: Zinc and Plastic Anchors,

P.R. 1 (Nov. 9, 2016) ("Scope Ruling Request").  In its Scope Ruling Request, Midwest described

its zinc and nylon anchors as follows:

The anchors are made of two components.  These components are a zinc or nylon body, and a steel pin.  In both cases, the body is the component that causes the product to function as an anchor when it is expanded against the sides of the hole drilled into the masonry. . . The Zinc Anchors are preassembled so that the pin is physically attached to the zinc body. They cannot be separated without destruction of the anchor.  In a Nylon Anchor, the steel pin is not permanently attached to the nylon body.  But the pin is not a nail because the head is rounded and slotted like the head of a screw, and the shaft is partially threaded. Moreover, the body, whether zinc or nylon, is the component which gives the anchor its ability to function.  This occurs when the pin is driven or screwed, in the case of the nylon anchors, into the body.  This causes the body to expand against the sides of the hole into which it is inserted.

Id. at 6, 8–9.

Midwest also cited HQ H030415, a 2010 ruling by Customs and Border Patrol ("CBP"),

which determined that steel nail and zinc masonry anchors previous classified under HTSUS 7317

(articles of iron or steel) were properly classified under HTSUS 7907.00.6000 ("Other articles of

zinc: Other").  HQ H030415: Classification of Steel Nail and Zinc Masonry Anchors, P.R. 1 (July

13, 2010) at Ex. 1.

Following Midwest's <u>Scope Ruling Request</u>, Mid Continent submitted comments arguing that Midwest's zinc and nylon anchors were within the scope of the <u>Orders</u>.  Letter from The Bristol Group PLLC to Sec'y of Commerce: Petitioner Opposition to Midwest Fastener Scope Ruling Request, P.R. 7 (Dec. 6, 2016) ("Mid Continent Rebuttal").   On December 20, 2016, Commerce issued a letter extending the deadline for issuing a final scope ruling on Midwest's <u>Scope Ruling Request</u> to February 13, 2017, "due to complexities of this scope request."  Certain Steel Nails from the Socialist Republic of Vietnam: Extension of Time for Scope Ruling, P.R. 8 (Dec. 20, 2016).

On February 13, 2017, Commerce sent a supplemental questionnaire to Midwest requesting: (1) whether the nail component could be separated from the anchor body, (2) product literature on Midwest's anchors, and (3) samples of the zinc and nylon anchors.  Request for Additional Information Pertaining to Midwest Fastener's Zinc and Nylon Anchors Scope Ruling Request, P.R. 10 (Feb. 13, 2017).   On February 21, 2017, Midwest submitted its response and supplemental materials.  Letter from Clark Hill PLC to Sec'y of Commerce: Resp. to Suppl. Questionnaire, P.R. 12–14 (Feb. 21, 2017) ("Midwest Resp.").  On March 1, 2017, Mid Continent filed comments in rebuttal to Midwest's response to the supplemental questionnaire.  Letter from the Bristol Group PLLC to Sec'y of Commerce: Petitioner Comments to Suppl. Questionnaire Resp., P.R. 15 (Mar. 1, 2017).   On April 24, 2017, Commerce issued a second letter, again extending the deadline for issuing a final scope ruling on Midwest's <u>Scope Ruling Request</u> to May 26, 2017, "due to the complexities of this scope request."  Certain Steel Nails from the Socialist Republic of Vietnam: Extension of Time for Scope Ruling, P.R. 16 (Apr. 24, 2017).

On May 17, 2017, Commerce issued its <u>Antidumping and Countervailing Duty Orders on Certain Steel Nails from the Socialist Republic of Vietnam: Final Scope Ruling on Midwest</u>

Fastener, Corp.'s Zinc and Nylon Anchors, P.R. 17 (Dep't Commerce May 17, 2017) ("Final

Scope Ruling"), in which it determined that Midwest's zinc and nylon anchors were included

within the unambiguous language of the scope of the Orders because they consisted of two

components: a steel nail with a zinc or nylon anchor body attached.   Specifically, Commerce

determined that: (1) a plain reading of the scope covered any nail consisting of two components

with any steel content, and (2) that the (k)(1) sources, including the ITC Report, and its prior scope

rulings supported its conclusion.   Id. at 12–13.   On June 2, 2017, Commerce instructed CBP to

continue to suspend liquidation of entries of certain steel nails from Vietnam, including Midwest's

zinc and nylon anchors.   Message No. 7153302: CBP Posted Instructions from Commerce, P.R.

18 (July 27, 2017).

      Midwest filed a complaint with this court contesting the Final Scope Ruling and on

November 28, 2017, Midwest submitted its Motion for Judgment on the Agency Record and Brief

in Support.   Compl., June 30, 2017, ECF No. 11; Pl.'s Br., ECF No. 32.   Defendant the United

States ("the Government") and defendant-intervenor Mid Continent submitted their briefs in

opposition on March 7, 2018.   Def.'s Br., ECF No. 38; Def.-Inter.'s Br., ECF No. 37.   Midwest

filed its reply brief on April 9, 2018.   Pl.'s Reply, ECF No. 39.   Oral argument was held before

this court on September 12, 2018.   ECF No. 47.

**DISCUSSION**

      The Government argues that (1) the plain meaning of the unambiguous language of the

scope of the Orders includes Midwest's zinc and nylon anchors; (2) the (k)(1) sources -- including

the description of the merchandise, the ITC Report, and Commerce's prior scope determinations -

- support its determination that Midwest's zinc and nylon anchors reasonably fall within the plain

meaning of the scope language; (3) Commerce properly did not initiate a (k)(2) formal scope

inquiry because the plain meaning of the <u>Orders</u> and the (k)(1) factors dispositively include

Midwest's anchors within the scope of the <u>Orders;</u> and (4) Commerce properly instructed CBP to

continue suspension of liquidation of Midwest's zinc and nylon anchors because its anchors had

always been subject merchandise under the scope of the <u>Orders</u>.

## I.    <u>The Unambiguous Language of the Scope of the Orders Does Not Include Midwest's Anchors.</u>

The Government argues that the plain description of the scope of the <u>Orders</u> covering

"certain steel nails of two or more components" includes zinc and nylon anchors. Def.'s Br. at 13.

Specifically, the Government argues that any nail consisting of one or two components falls within

the plain meaning of the scope language because the scope of the <u>Orders</u> (1) fails to specify what

shall be considered a two-piece nail and (2) fails to specify a steel content specification. <u>Id.</u>

Therefore, any steel nail is considered subject merchandise. <u>Id.</u> Further, the Government argues

that the "steel pin" is the critical component because the anchor cannot function without it. <u>Id.</u>

Therefore, according to the Government, Midwest's products are two-piece nails covered by the

plain language of the <u>Orders</u>.

As the Federal Circuit has held, the terms of an order govern its scope. <u>Duferco</u>, 296 F.3d

at 1097; <u>see</u> <u>Eckstrom Indus</u>, 254 F.3d at 1072; <u>Wheatland Tube</u>, 161 F.3d at 1370. Additionally,

"[a]lthough the scope of a final order may be clarified, it can not be changed in a way contrary to

its terms." <u>Duferco</u>, 296 F.3d at 1097 (quoting <u>Smith Corona Corp.</u>, 915 F.2d at 686). For that

reason, "if [the scope of an order] is not ambiguous, the plain meaning of the language governs."

<u>ArcelorMittal</u>, 694 F.3d at 87.

"In determining the common meaning of a term, courts may and do consult dictionaries,

scientific authorities, and other reliable sources of information, including testimony of record."

<u>NEC Corp.</u>, 74 F. Supp. 2d at 1307 (quoting <u>Holford</u>, 912 F. Supp. at 561). A nail, as defined by

OXFORD'S ENGLISH DICTIONARY (3rd ed. 2003) is "a small metal spike with a sharpened end and a blunt head, which may be driven in to a surface with a hammer or other tool in order to fasten things together." THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 2000) defines a nail as "[a] slim, pointed piece of metal hammered into material as a fastener." Similarly, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY OF THE ENGLISH LANGUAGE (UNABRIDGED) ("WEBSTER'S) (1993) defines a nail as "a slender and usually pointed and headed fastener designed for impact insertion." These definitions present a "single clearly defined or stated meaning": a slim, usually pointed object used as a fastener for impact insertion. Unambiguous, WEBSTER'S (1986), quoted in Meridian, 851 F.3d at 1381 n.7. Therefore, "nail" is an unambiguous term.

The merchandise here does not fit into the above definitions. Midwest describes its zinc and nylon anchors as: "a zinc or nylon body, and a steel pin." Scope Ruling Request at 6. Commerce made its determination based upon the steel pin, arguing "a critical portion of the two-piece anchors (i.e., the nail itself) is, in fact, made of steel." Final Scope Ruling at 12. However, Midwest's zinc anchors "cannot be separated without destruction of the anchor," Scope Ruling Request at 9, and the nylon anchor "will not function without the pin. That is, the pin expands the nylon body when it is driven or screwed into place," Midwest Resp. at 2. As neither of Midwest's anchors are reasonably separable, they are unitary articles of commerce, which Commerce seems to acknowledge in its Final Scope Ruling. Final Scope Ruling at 12 (describing Midwest's products as "two-piece items" and "steel nail[s] of two components"). Accordingly, the entire product, not just a component part, must be defined as a nail to fall within the scope of the Orders.

To be sure, under the Orders, "[c]ertain steel nails may . . . be constructed of two or more pieces." Here, however, the entire product is not a nail "constructed of two or more pieces." As

stated <u>supra</u>, a nail is defined as a fastener inserted by impact into the materials to be fastened. However, Midwest's anchors are not inserted by impact into the materials to be fastened; rather, "the body is the component that causes the product to function as an anchor when it is expanded against the sides of the hole [pre-]drilled into the masonry." <u>Scope Ruling Request</u> at 6; <u>see also</u> <u>OMG, Inc. v. United States</u>, 42 CIT ___, Slip Op. 18-63 (May 29, 2018) at 10; <u>Simpson Strong-Tie Co. v. United States</u>, 42 CIT ___, Slip Op. 18-123 (Sept. 21, 2018) at 11.   Therefore, unlike two-piece nails, Midwest's anchors are not inserted by impact into the materials to be fastened and do not grip by friction in the same manner as a nail.

Trade usage further supports the determination that Midwest's anchors are not nails. Commerce must interpret the language of a scope order in its proper context. <u>ArcelorMittal</u>, 694 F.3d at 88.  Proper context means that "the terms of the order should be consistent, to the extent possible, with trade usage." <u>Id.</u>  Because antidumping duty orders apply to imported goods, the proper context is trade usage regarding delivered goods.    <u>Id.</u>    Therefore, Commerce's determination must be reasonable in light of how the industry treats anchors as a unitary article, not individual components.

Commerce's determination that anchors are two piece nails does not reasonably conform to trade usage.  The examples provided in the record and in response to Commerce's supplemental questionnaire support Midwest's argument that the nail industry categorizes anchors with steel pins as anchors, entirely apart from nails. <u>See</u> <u>Scope Ruling Request</u> at 8; <u>Mid Continent Rebuttal</u> at Exs. 4–5; <u>Midwest Resp.</u> at Ex. 1.  For example, when the word "nail" is used, it is done so to either explicitly or implicitly modify the noun "anchors" as in "Heavy Duty Nail Drive Anchor," "Mushroom Head Nail Drive Anchors," and "Truss Head Nail Drive Anchors." <u>Mid Continent Rebuttal</u> at Ex. 5; <u>Midwest Resp.</u> at Ex. 1.  These examples indicate that industry usage comports

with the plain meaning of the word "nail."  Thus, according to industry usage, the pin is a nail but

the unitary article of commerce is an anchor.[3]

     The Government asserts that Commerce reasonably concluded that "the industry describes

masonry anchors similar to a variety of other nails in different categories (e.g., finishing nails,

masonry anchors, corrugated nails, etc.)."  Def.'s Br. at 16–17 (quoting Final Scope Ruling at 13).

However, neither Commerce in its Final Scope Ruling nor the Government in its brief furnished

support for this proposition.

     The court's prior decision in OMG supports this conclusion.  In that case, this court

addressed whether plaintiff OMG's merchandise -- a zinc anchor body with a steel pin -- fell within

the meaning of the term "nail" in the Orders.  OMG, Slip Op. 18-63 at 10–11.  The court

determined that the OMG zinc anchor was unambiguously excluded from the scope of the Orders

because: (1) the term "nail" was unambiguous and distinct from the term "anchor"; (2) trade usage

regarding delivered products guides interpretation of the proper meaning of the terms of a scope

order; (3) the OMG merchandise, as a unitary article of commerce, was an anchor; and (4) the

record demonstrated that the nail industry categorized the OMG merchandise as an anchor, not a

nail.  Id.

     Similarly, here, Midwest's merchandise consists of an anchor body attached to a steel pin.

Scope Ruling Request at 6.  Although Midwest's merchandise also includes a nylon anchor, the

---

[3] In its rebuttal comments and at oral argument, Mid Continent suggested that trade usage supports
Commerce's conclusion that anchors are considered two-piece nails by the relevant industry
because some hardware stores sell nails and anchors under the general category of fasteners but
distinguish screws by name.  See Mid Continent Rebuttal at Ex. 4.  The court is unpersuaded by
this argument.  There is no dispute that both anchors and nails are fasteners; the issue is whether
anchors are two-piece nails.  Mid Continent's record evidence showing that both nails and anchors
are categorized as fasteners does not support the conclusion that anchors are considered a type of
nail.

distinction from a zinc anchor is immaterial because neither product is reasonably separable.  Final
Scope Ruling at 4–5; see also Simpson, Slip Op. 18-123 at 13.  Additionally, as discussed above,
both products are categorized as anchors by the nail industry.  Therefore, just like OMG's
merchandise, Midwest's zinc and nylon anchors, taken as unitary articles of commerce, are not
two-piece nails within that word's plain meaning and thus do not fall within the unambiguous
scope of the Orders.  See OMG, Slip Op. 18-63 at 11.[4]

## CONCLUSION

The court remands to Commerce for further consideration consistent with this opinion.[5]
Commerce shall file with the court and provide to the parties a revised scope determination within
90 days of the date of this order; thereafter, the parties shall have 30 days to submit briefs
addressing the revised final determination to the court and the parties shall have 15 days thereafter
to file reply briefs with the court.

**SO ORDERED.**

/s/    *Gary S. Katzmann*
Judge

Dated:   October 1, 2018
              New York, New York

---

[4] Meridian Products v. United States, 890 F.3d 1272 (2018), does not affect this conclusion.  In
that case, the Federal Circuit determined that the court had not afforded sufficient deference to
Commerce's interpretation of the scope language because "Commerce's original scope ruling
[wa]s reasonable and supported by substantial evidence" in that case.  Id. at 1281 (citing Nippon
Steel Corp. v. United States, 458 F.3d 1345, 1359 (Fed. Cir. 2006) (holding that deference is due
"[s]o long as there is adequate basis in support of the [agency's] choice of evidentiary weight")).
In this case, however, Commerce's determination that anchors fit within the definition of nails,
viewed within the context of the relevant industry, is not reasonable or adequately supported for
the reasons already discussed.  Thus, Commerce's interpretation of the scope language here is not
entitled to deference.

[5] Commerce shall issue appropriate instruction to U.S. Customs and Border Protection regarding
the retroactive suspension of liquidation.